MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

CHRISTINE Y. WONG (NYBN 3988607)
Assistant United States Attorney

  450 Golden Gate Avenue, Box 36055
  San Francisco, California 94102
  Telephone: (415) 436-7301
  Facsimile: (415) 436-6753
  E-Mail:     Christine.Wong@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 11-0182 CRB |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| v. | ) | |
| | ) | **Sentencing Date: October 19, 2011, 2:15** |
| ROBERTO ACOSTA, | ) | **p.m., The Honorable Charles R. Breyer** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

The Government respectfully requests that the defendant be sentenced to 60 months' imprisonment.

**FACTUAL BACKGROUND**

Starting in about March 2005, the defendant provided information to ICE agents about the Bay Area activities of La Mara Salvatrucha, a transnational, violent gang, also known as MS-13.  The defendant was debriefed on numerous occasions in 2008 by ICE agents and the prosecutors working on the investigation about his criminal history in the United States and in Honduras.  During the course of various debriefings in 2008, the defendant admitting that he had

committed various criminal acts, but despite being asked point blank about whether he had committed murder, the defendant denied having done so.

On February 2, 2011, in a meeting to prepare the defendant as a witness for trial, the defendant was asked again about his criminal history. At this meeting, for the first time, the defendant admitted to shooting a makeshift firearm into the shoulder of a robbery victim during a robbery that had gone awry. Trial Tr. at 96-97. Noticing that this was the first admission of the defendant ever shooting a firearm, the prosecutor asked if the defendant had shot a weapon after that incident, and the defendant stated, "Yes." Special Agent Moore testified at trial that the prosecutor asked the defendant if he had shot a weapon more than ten times, and he responded, "More"; she asked if he had shot a weapon more than ten times, and he said, "More,"; she asked if he had shot a weapon more than twenty times, and he said, "More"; finally, when asked if he had shot a weapon more than thirty times, he said, "I don't know." Trial Tr. at 97-98.

The defendant then discussed his time in prison, and what he did after his release, explaining that he was sent from San Pedro Sula to Tegucigalpa to help run an MS-13 clique there. The defendant admitted that during this time, he personally killed five individuals and orchestrated the murder of three others. Specifically, the defendant stated that, in or about August 2003, he "got orders to – to take out a rival drug dealer who was not an MS-13 member, and that he was to find this guy and get rid of him; kill him." Trial Tr. at 100. The defendant explained that "he found the individual that . . . MS was looking for. He got a gun, and ambushed him, and shot him in the street; possibly in the head and in the – and in the back." The defendant told the agents that he thought that he killed him. This was the defendant's first murder victim.

The defendant stated that during murders of victims two and three, he was driving a carload of MS-13 members. "He had a 9-millimeter handgun. The people in the car he was with had assault rifles. They were driving through [a rival gang's] territory. Individuals they believed to be [rival gang] members crossed in front of the car. And they all jumped out of the car. . . . [H]e unloaded his clip, and . . . the other guys also unloaded their assault rifles, and dropped the two gentlemen." He did not know the names of those victims. Trial Tr. at 100-101.

1   The defendant described the murder of victim number four, in which he was ordered to

2   kill an "unaffiliated female who was not an MS-13 member, who –he didn't even know why . . .

3   he had been given the order."   The defendant stated that "he and another MS-13 member were

4   able to get her in a car on a ruse, and drive her to the outskirts of Tegucigalpa, where his

5   passenger dragged the woman out of the car, and shot her.  And he [the defendant] also shot the

6   woman as well."   The defendant did not know the name of this victim either.  Trial Tr. at 101-

7   102.

8   The defendant's fifth murder victim was an MS member who went by the street moniker

9   "La Flaca."  The defendant "and another MS-13 member set up . . . a surveillance on her house,

10   to see if they could grab her coming or going from the house she was allegedly supposed to be

11   living at.  And they couldn't find her.  And then the guy [the defendant] was with went up and

12   knocked on the door, to see if she was there, and maybe they could just grab her out of the house.

13   She wasn't there."  Special Agent Moore further testified, "He –this other MS member comes

14   back to the car.  They're sitting in the car, and they observe La Flaca wlaking up tot he house

15   with, like, a seven-year-old boy.  And the other guy wants to do it, then and there.  He wants to

16   just walk up to her, and kill her in the street."  The defendant stated that he stopped the other

17   person and said, "No. You can't do it that way."  The defendant stated that they called her, and

18   got her to come down out of the house, but the defendant and his accomplice "get the woman in

19   the car; drive her to the outskirts."  The defendant described "taking the woman out of the car,

20   putting her on her knees, having her beg for her life, and shooting her in the back of the head."

21   The defendant stated that when she was begging for her life, he said to her, "You know how it

22   is."  Trial Tr. at 103-104.

23   The defendant then described the murders of victims six, seven and eight.  He was

24   ordered to kill two women, who were unaffiliated with MS-13.  The defendant did not know why

25   he was ordered to kill them.  The plan was to "bring them out to sort of a house on the outskirts

26   of town, but they were accompanied by a male who they weren't expecting."  The defendant

27   stated that "he was able to get different members of MS to take these people out into the woods,

28

and strangle them, and then . . . he had taxi drivers come and pick up the bodies and dispose of the bodies." Trial Tr. at 104-105.

On March 29, 2011, an indictment was filed, charging the defendant with a violation of 18 U.S.C. § 1001, making a false statement. On July 12, 2011, the defendant was convicted of the charge in the indictment by a jury.

## THE SENTENCING GUIDELINES

As calculated by the Probation Office, the total offense level is six, pursuant to U.S.S.G. § 2B1.1(a)(2). The defendant has no criminal convictions in the United States, which results in zero criminal history points; therefore the criminal history category is I. The guidelines range is 0-6 months' imprisonment. The defendant has two criminal convictions in Honduras, specifically, on September 9, 1999, for possession of a firearm, and on October 9, 2000, for robbery. PSR at ¶ 31. The defendant also was found illegally in the United States and deported on July 27, 2000. Id. Given the defendant's significant criminal history, including the murders described above, the Probation Office believes that the defendant is more adequately represented by Criminal History Category VI, and the Guidelines range would be 12 to 18 months' imprisonment. Id. at ¶ 64.

## A SENTENCE OF 60 MONTHS IS REASONABLE AND APPROPRIATE UNDER SECTION 3553(a) FACTORS

In sentencing the defendant for violating Section 1001, the Court must consider, among other things, the history and characteristics of the defendant, the need for the sentence to promote respect for the law and provide just punishment, and to afford adequate deterrence. 18 U.S.C. § 3553(a). Nothing short of 60 months' imprisonment, a sentence at the statutory maximum, adequately accounts for the defendant's murders of at least eight people and his attempt to wring benefits from the Government by lying about those murders.

The defendant stated that he became an MS-13 member when he was approximately 14 years old. PSR at ¶ 35. He reported that he was cornered in a remote area by members of a rival gang, and he was "sliced and stabbed with a machete, but was saved by the owner of the farm, who approached the scene with a shotgun." PSR at ¶ 35. He further told the agents that after

this incident, "he was at the brink of death at the hands of these guys, which [Special Agent Moore] thinks fuels what he tells [Special Agent Moore and the prosecutor] next, which is that the city sort of breaks down into . . . a warlike atmosphere." Trial Tr. at 96.  In other words, rather than be deterred by the attack on his life, the defendant became further entrenched in gang activity, and took part in "potentially 20 or 30 times where he'd fire a weapon, . . . around these gun fights in the streets of San Pedro Sula, where MS-13 and 18th Street have blocks and corridors." Trial Tr. at 98.  The defendant then returned to prison in Honduras, and "was sent from San Pedro Sula down to Tegucigalpa, to help run an MS clique that was struggling in Tegucigalpa." Trial Tr. at 99.  To do so, he "was supposed to solidify MS' presence within certain neighborhoods of Tegucigalpa as a drug stronghold.  And he was also supposed to clean up . . . the behavior of the members, because there were a lot of people that weren't following rules." Trial Tr. at 99.  It was during this time period that the defendant brutally murdered five men and women, including a woman who begged for her life, and orchestrated the murders of three others.

The defendant may argue that he was ordered to commit these murders, and that if he failed to commit these murders, he himself would have been killed.  The defendant, however, chose the gang in the first place, and reaffirmed his commitment to the gang even after he was nearly killed by rival gang members.  Certainly after his near-death experience, he had no illusions about the nature of the gang, and yet, he remained in it, choosing to accept orders to kill multiple victims–some of whom he had no idea why their deaths had been ordered, none of whom he knew by name.  There is no excuse for the utter lack of regard for human life that the defendant demonstrated by executing the orders to kill.

The circumstances at the end of his tenure with MS-13 are undoubtedly tragic–his father, his brother, and his sister were killed by MS-13 members to retaliate for the defendant's alleged theft of funds from the gang.  Indeed, the defendant may have attempted to seek redemption, or at least the ability to stay in the United States, by cooperating with the Government.  But the defendant was not entitled to trick the Government into giving him immigration benefits and cash rewards, albeit in exchange for valuable information, by lying about his own criminal

conduct.  The defendant's cooperation ultimately unraveled in light of his prior denials about these horrific crimes, namely, his repeated denials that he was personally involved in any murders.  As Special Agent Merendino testified, the defendant would never have been given the opportunity to act as an informant for the Government if the agents knew that he had committed eight murders.  Trial Tr. at 56.  The defendant had to have known that if he told the truth about those murders, he would not be allowed to cooperate with the Government, and without cooperation, his immigration status in the United States would vanish, as would his source of income.  He gamed the system by lying about his past, and he should not be rewarded for it.  His lies had far-reaching implications for the Government's other trials and prosecutions, the implications of which are a constant reminder of the seriousness of the defendant's charged crime.   Accordingly, the defendant should be sentenced to the statutory maximum allowed under Section 1001–a sentence of 60 months' imprisonment.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests a sentence of 60 months' imprisonment.

DATED: October 11, 2011

Respectfully submitted,

MELINDA HAAG
United States Attorney


_____/s/_____
CHRISTINE Y. WONG
Assistant United States Attorney

-6-