1  DENNIS P. RIORDAN (SBN 69320)
   DONALD M. HORGAN (SBN 121547)
2  RIORDAN & HORGAN
   523 Octavia Street
3  San Francisco, CA 94102
   Telephone: (415) 431-3472
4
   MARTHA BOERSCH (SBN 126569)
5  LAW OFFICES OF MARTHA BOERSCH
   235 Montgomery Street
6  San Francisco, CA 94104
   Telephone: (415) 562-8587
7
   Attorneys for Defendant
8  ROBERTO ACOSTA

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12

13  UNITED STATES OF AMERICA,        )   Case No. CR 11-00182 CRB
                                     )
14              Plaintiff,           )
                                     )
15      vs.                          )   Date:  December 14, 2011
                                     )   Time:  10 a.m.
16  ROBERTO ACOSTA,                  )   Judge: The Honorable Charles R. Breyer
                                     )
17              Defendant.           )
                                     )
18                                   )
                                     )
19  _____ )

20

21         DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
           IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL UNDER
22         FED.R.CRIM.P 29 OR FOR A NEW TRIAL UNDER FED.R.CRIM.P. 33

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.     Acosta's Involvement in MS-13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.     Acosta's Role as a Government Informant. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.     Acosta's Preparation as a Witness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      D.     Acosta's Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      E.     The Acosta Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      F.     The Government's Closing Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      G.     The Court's Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    MR. ACOSTA MUST BE ACQUITTED UNDER RULE 29 BECAUSE
    THE GOVERNMENT FAILED TO PROVE THE CHARGED THEORY
    OF MATERIALITY; ALTERNATIVELY, HE IS ENTITLED TO A NEW
    TRIAL UNDER RULE 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.     The Rule 29 Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.     The Charged Theory of Materiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      C.     The Government Failed To Prove the Theory of Materiality It
             Charged, Requiring Acquittal Under Rule 29 . . . . . . . . . . . . . . . . . . . . . . . . . 13

      D.     As The Government Failed To Prove the Theory of Materiality It
             Charged, Mr. Acosta Is Alternatively Entitled to A New Trial Under
             Rule 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.    THE GOVERNMENT FAILED TO PROVE THE UNCHARGED THEORY
    ON WHICH THE JURY WAS INSTRUCTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A.     The Government Failed to Prove The Theory of Materiality on
             Which the  the Jury Was Instructed, Again Requiring Acquittal
             Under Rule 29 and a Conditional Grant of A New Trial Under Rule 33 . . . . . . . 16

      B.     The Government's Reliance On An Uncharged Theory of Materiality
             Requires a New Trial Under Rule 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.   THE COURT'S INSTRUCTIONS AND THE GOVERNMENT'S
    CLOSING ARGUMENT PERMITTED THE JURY TO CONVICT ON
    A FALSE STATEMENT OTHER THAN THE SINGLE STATEMENT
    CHARGED IN THE INDICTMENT, REQUIRING A NEW TRIAL UNDER
    RULE 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.   THIS POST-TRIAL MOTION IS TIMELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

## CASES

*Hamling v. United States*,
418 U.S. 87 (1974)     12

*Jackson v. Virginia*,
443 U.S. 307 (1979)     12

*Stirone v. United States*,
361 U.S. 212 (1960)     17

*Strickland v. Washington*,
466 U.S. 668 (1984)     21

*United States v. Adamson*,
291 F.3d 606 (9th Cir. 2002)     17

*United States v. Alston*,
974 F.2d 1206 (9th Cir. 1992)     15, 16

*United States v. Charles*,
313 F.3d 1278 (11th Cir. 2002)     12

*United States v. Holley*,
942 F.2d 916 (5th Cir. 1991)     21

*United States v. Kellington*,
217 F.3d 1084 (9th Cir. 2000)     15

*United States v. Lyons*,
472 F.3d 1055 (9th Cir.2007)     21

*United States v. McCormick*,
500 U.S. 257 (1991)     15

*United States v. Milwitt*,
475 F.3d 1150 (9th Cir. 2007)     12

*United States v. Munoz*,
605 F.3d 359 (6th Cir. 2010)     21

*United States v. Nevils*,
598 F.3d 1158 (9th Cir. 2010)     12

*United States v. Sarihifard*,
155 F.3d 301 (4th Cir. 1998)     17

*United States v. Shipsey*,
190 F.3d 1081 (9th Cir. 1999)     18

*Van Liew v. United States*,
321 F.2d 674 (5th Cir. 1963)     12

**STATUTES**

18 U.S.C. § 1001                                                                6

Fed. R. Crim. P. 29(d)(1)                                                       15

**INTRODUCTION**

As the government itself proved at trial, beginning in 2005, Roberto Acosta provided invaluable assistance to a federal criminal investigation of the activities in Northern California of MS-13, an extremely violent street gang with roots in Central America.  With one interruption of several months in 2006 and 2007, when he was deported back to his native Honduras, Acosta served, at no small danger to himself, as an undercover informant within the San Francisco branch of MS-13, surreptitiously tape recording conversations with members who described their engagement in drug trafficking and many crimes of violence, including murder.  Acosta's undercover work ended in 2008 when dozens of MS-13 members were indicted on charges largely based on information provided by Acosta to agents of ICE, the federal agency for Immigration and Customs Enforcement.

Over a period of several years, Acosta had been debriefed by ICE agents on his own criminal history.  He gradually provided more and more information in that regard, including admissions of drug dealing and violent offenses such as robbery.  Before the middle of 2008, he had not admitted any involvement in murders.  After the indictment in the massive MS-13 prosecution, Acosta began to work with federal prosecutors in preparation for his testifying at trial.  In December of 2008, during an interview with prosecutors, he admitted his past involvement in the murder of bus drivers in Honduras who had resisted extortion efforts by the MS-13.  At that time, Acosta denied that he ever had killed any one personally.  The government thereafter maintained its intention to call Acosta as a principal witness at the omnibus MS-13 trial.

On the eve of trial in February of 2011, however, Acosta was again debriefed, and on this occasion told the authorities that he had been involved in eight additional murders, some of which he committed personally.  Within two days, the government charged him with making material false statements to government officials.

//

//

1

1   The indictment was clear as to the time and content of the false statement being charged.

2   It read:       In or about December 2008, in the Northern District of California, the defendant,

3                              ROBERTO ACOSTA,
                                a/k/a "Zorro,
4                              a/k/a "Little Bad Boy,"
                                a/k/a "Bad Boy,"
5
6                    unlawfully, knowingly, and intentionally, in a matter within the
                     jurisdiction of the executive branch of the Government of The
                     United States, did make a materially false, fictitious, and
7                    fraudulent statement and representation, to wit, during a debriefing
                     with federal prosecutors and a Special Agent with Immigration and
8                    Customs Enforcement, ACOSTA falsely denied being involved in
                     any murders or attempted murders aside from one indictment
9                    involving bus drivers in Honduras, when in fact, he was directly
                     involved in approximately eight additional murders in Honduras.
10                   All in violation of Title 18, United States Code, Section 1001.

11          While the indictment was less than pellucidly clear as to the government's theory of

12   materiality, the reference to federal prosecutors and the timing of the charged false statement

13   rendered that theory apparent.  In December of 2008, Acosta was no longer an undercover

14   informant, as his identity as a government agent had been revealed when the MS-13 indictment

15   was unveiled.  From that point on, he was working with the government in his capacity as an

16   intended trial witness. The indictment thus alleged that his false statement to prosecutors in

17   December of 2008 was material to preparation and presentation of the prosecution's case in the

18   2011 trial of the MS-13.

19          At Mr. Acosta's trial, the government failed to prove its charged theory of materiality.

20   That theory posited that prosecutors had decided not to call Acosta at trial because the charged

21   denials of personal involvement in murders in December of 2008, admitted by Acosta to be lies

22   in February of 2011, so weakened his credibility that he could no longer be called as a witness

23   for the government. The government failed to produce a witness against Acosta competent to

24   testify as to why the government did not call him–e.g., a AUSA prosecuting the MS-13 case.

25   Indeed, given the absence of any such proof, this Court barred the government from even

26   arguing the theory of materiality charged in the indictment, and Acosta's jury was not instructed

27   on it.  Due to the failure of the government's proof on the materiality element, defendant Acosta

28   is entitled to a directed verdict of acquittal under Rule 29, or, at a minimum, to a new trial under

1  the more favorable standard of Rule 33.

2        The same holds true for the uncharged theory of materiality on which the case did go to

3  the jury–*i.e*, that Acosta's false statement in December of 2008 was material to ICE's decision to

4  use him as an informant.  The jury was instructed that to convict, the government had to prove

5  that Acosta's false statement "was material to the activities or decisions of Immigration and

6  Custom Enforcement."  There was testimony offered at trial that had ICE agents known of Mr.

7  Acosta's past criminal history when it first employed him as an informant in 2005, or had they

8  learned of that history while he was working as an informant, they would not have started or

9  continued his employment for fear he would wander off the reservation and create "liability" by

10  committing crimes while on the public fisc.  But while Acosta's purported deceptions in earlier

11  interviews between 2005 and mid-2008 might have affected ICE's decision to use him as an

12  informant at that time, he was not charged with any of those false statements.  By December of

13  2008, his sole function for the government was to prepare his testimony as a government

14  witness, and, as explicated above, the government failed to prove that the charged statement was

15  material to that function.  In sum, the government failed to prove not only the theory it alleged in

16  the indictment, but failed to prove the unalleged theory on which the jury was instructed. For

17  these reasons, Acosta again is entitled to a Rule 29 acquittal and, alternatively, a new trial under

18  Rule 33.

19        Finally, and perhaps most obviously, Acosta is entitled to a new trial due to the

20  constructive amendment of the indictment worked by the Court's instructions.  As the Court

21  noted during Acosta's trial, the indictment charged his making of a false statement in December

22  of 2008, not at any other time.  Even if had there been ample evidence in the record that Acosta

23  lied about his criminal history at times before December of 2008, he could not be convicted of a

24  section 1001 violation based on those lies, because they were not charged in the indictment.  The

25  government argued to the jury the existence of more than one false statement, but the Court's

26  instructions neither informed the jury that only the December 2008 interview could support the

27  1001 charge, nor required unanimity as to that charged statement and that statement alone.  That

28  constructive amendment violation requires a grant of a new trial under Rule 33.

**STATEMENT OF FACTS**

**A.      Acosta's Involvement in MS-13**

Defendant Roberto Acosta is a Honduran member of La Mara Salvatrucha, or MS-13, a violent street gang with roots in Honduras. [Gov't Trial Brf. at 1; Gov't Sent. Mem. at 1]. Acosta became a member of MS-13 after he was "cornered in a remote area by members of a rival gang" and was "sliced and stabbed with a machete." [Gov't Sent. Mem. at 4]. The rival gang "cut him to pieces. They stabbed him. They sliced his head open; smacked his head open." RT 97. The city at that time "br[oke] down into . . . a warlike atmosphere" and, after this near-death experience, Acosta became a member of MS-13. RT 97.[1]

**B.      Acosta's Role as a Government Informant**

Acosta acted as an undercover informant for Immigration and Customs Enforcement ("ICE") in the United States beginning in 2005. RT 5. He became an informant after fleeing from Honduras to escape a death threat against him from MS-13. Acosta was ordered by MS-13 to kill his own pregnant wife and her brother or be killed himself. [Def. Sent. 's Mem. at 5;  RT 108-09] Defendant's father, brother, and sister had already been murdered by MS-13 in June and October of 2004 (RT 77) – his brother and sister were murdered before Acosta's eyes. RT 138. His father was murdered in retribution for Acosta's supposed theft of funds from the gang. Gov't Sent. Mem. at 5.

Acosta acted as an undercover informant from July 2005 until approximately October 2008 (with one interruption), when over 40 members of MS-13 were arrested in San Francisco and Acosta's identity as the informant was revealed. RT 23, 69, 131. During the time he acted as an informant, Acosta gave "valuable information" to the government and made "hundreds of hours of recordings of these MS-13 members committing crimes" (RT 5), and ICE was "very satisfied with the truthfulness of his information." RT 38. Acosta's information was the basis for the arrests of more than 40 members of MS-13 in San Francisco. RT 55. After the arrests of the MS-13 members, ICE agents spent "larger time periods" with Acosta than they had before in

---

1 RT refers to the Reporter's Transcript of 7/11/11, the single day of testimony at Acosta's trial. Cites to the the Reporter's Transcript of proceedings on other days will include those dates.

an effort to prepare him to be a witness in the upcoming trials.  RT 69.

During the time he acted as an informant, Acosta described many unlawful acts he committed in Honduras, including kidnaping and attempted murder (RT 75); robbery and stealing (RT 76), possession of a homemade firearm (RT 75); driving around with other MS-13 members with guns in the car, looking for rival gang members (RT 76); collecting money from drug dealing (RT 76), and grenade smuggling (RT 80).   Despite the government's knowledge of Acosta's deep involvement in the activities of MS-13 in Honduras, the government never asked him, during the time he acted as an informant, whether he himself had participated in any murders while he was an MS-13 member in Honduras.  Indeed, the government never directly asked Acosta whether he participated in any murders until the pretrial interviews began after February 2008, and after he had already described "numerous graphic incidents of murder, decapitation, and dismemberment of individuals before his own eyes."  RT 77, 79-80.

## C.    Acosta's Preparation as a Witness

By May 2008, ICE was through using Acosta as an informant, and continued to move forward with him as a witness.  RT 169, 173.  It was during this phase that Acosta was first asked about his participation in murders during a May 2008 pretrial interview.  He denied participating in any murders.  RT 139-40.  Although ICE agents were in contact with Acosta five to seven days a week between June and December 2008, Acosta was not asked again about murders until December 2008.  RT 85-87.  At that time, the government broadened the definition to include participating in or causing any murders.  *Id*.  At this time Acosta admitted to passing along orders to murder three bus drivers in Honduras.  RT 88.  He denied involvement in any other murders.  In ICE Special Agent John Moore's view, Acosta's denial of murders in May 2008 was not necessarily a lie, because "I . . . thought there was a significant misunderstanding about the way the question had been asked; that – as far as what it meant to kill someone, and what it means to be legally responsible for someone's death."  RT 166-167. February of 2011 was the first time Moore came to believe Acosta had not been truthful.  RT 167.

After Acosta had admitted the three bus driver murders, as well as some drug dealing, prosecutors discussed whether to charge him with those offenses, "which would not in any way

have prohibited him from testifying in the case," "to hold him accountable for any criminal conduct that he may be responsible for." RT 91, 129.  In June 2009, Acosta was interviewed again and described the murders of the three bus drivers in some detail.  RT 92.

The next substantive interview of Acosta was on February 2, 2011, when he was interviewed by a new prosecutor and Moore.  At that time, the government still intended to call Acosta as a witness at trial.  RT 95, 132.  The government again asked Acosta about his criminal history.  During this interview Acosta admitted to an additional five murders in Honduras, sometime between April 2003 and April 2004.  RT 101-07.  Acosta was visibly shaken and distraught when recounting the murders.  RT 107.  Moore's first thought was "to build him back up."  *Id*.  Moore told Acosta "this doesn't necessarily need to end."  *Id*.  The prosecutor, however, was "irate; very angry with [Acosta]; very disappointed."  RT 110.  In response, Acosta said that he had told ICE Special Agent Chris Merendino, that he "never lied" to Merendino.  RT 110.  At the conclusion of this meeting, another meeting was scheduled with Acosta for two days later.  RT 111.  Moore wanted Acosta to feel "like we still had, you know, a relationship, an agreement, . . . in the sense that he was still in good standing because, personally, I didn't know what was going to happen."  *Id*.  As far as Moore was concerned, he "wanted to make sure that [Acosta] felt that we were on good standing still."  RT 134-135.  After the meeting, ICE attempted to confirm the fact of these murders with the Hondurans, but "were never able to confirm or disconfirm any information about these murders."  RT 112.  According to Moore, the revelation of these murders affected the investigation because "we had a considerably different person on our hands . . . than what we had believed prior to that meeting."  RT 113.  Nevertheless, the prosecutors were still prepared to use Acosta as a witness in their case against the MS-13 defendants.  RT 145.

### D.    Acosta's Indictment

On February 4, 2011, Acosta was charged by criminal complaint with a violation of 18 U.S.C. § 1001.  The original criminal complaint against Acosta, filed on February 4, 2011, was utterly silent on the element of materiality  (CR 1 [Crim. Comp.]), and the affidavit in support of the complaint did not mention the element of materiality, nor did it contain any facts going to

that element.  A single count indictment was returned on March 29, 2011.  The indictment

alleged that in December 2008 Acosta knowingly and intentionally made a materially false

statement during a debriefing with federal prosecutors and a Special Agent with ICE.  The false

statement was a denial of "being involved in any murders or attempted murders aside from one

incident involving bus drivers in Honduras, when in fact, he was directly involved in

approximately eight additional murders in Honduras."  CR 10.  The indictment contained no

further allegations, nor did it elucidate why the alleged false statement was material or to whom.

*Id*.

Indeed, the government was still prepared to call Acosta as a witness after he had

admitted the murders and been charged with a false statement.  Acosta continued to work to

prepare for his testimony as a witness after he revealed his involvement in the murder of the

three bus drivers.  RT 128-129.  After Acosta's February 2, 2011 revelation of five additional

murders, the government continued to try to use Acosta as a witness.  In fact, the prosecutor told

Acosta that "nothing had changed."  RT 164 (Moore "remember[ed] Wilson Leung telling

Roberto that, you know, as of then, there was – nothing had changed").  Prosecutors met with

Acosta again on February 28, 2011, to try to determine whether the government would have him

testify and whether he would enter some sort of deal that would allow him to testify.  RT 141-43.

No deal was reached, and instead Acosta was indicted and  proceeded to trial.

### E.     The Acosta Trial

In its pretrial brief, the government summarized the evidence against Acosta and noted

that on "various occasions, including on December 2008," Acosta was asked about his criminal

history in the United States and Honduras.  Gov't Trial Brf. at 2.  The government stated that

Acosta's "failure to disclose his participation in eight murders, despite repeated questions about

the same, form the basis of the charge against him."  *Id*. at 2.  The government did not explain

how the failure to disclose was material or to whom, and simply noted that one element of the

crime was that " the statement was material to the activities or decisions of Immigration and

Customs Enforcement."

Trial commenced on July 11, 2011.  The government called three witnesses – ICE

7

Special Agent John Moore and Honduran National Police Officer Roberto Michel Bejarano-Galo, both of whom had been identified as witnesses in the government's trial brief, and ICE Special Agent Chris Merendino, who was not identified as a witness in the government's trial brief.

The government stated in its opening that Acosta's false statement "affected how [ICE agents and federal prosecutors] handled their work." RT 4. During 2008, Acosta "had -been meeting with ICE agents and prosecutors to get ready for an upcoming trial" to go over the evidence collected. RT 7. The government stated in its opening that Acosta lied in a debriefing in May 2008, and again in December 2008. RT 7. Although Acosta admitted to participating in the murders of three bus drivers in Honduras in the December 2008 debriefing, he denied that he had ever personally killed anyone. RT 7. It wasn't until February 2, 2011, that Acosta finally admitted to personally killing five people. RT 8. The government did not mention the element of materiality during its opening statement and said nothing about how the alleged false statement(s) were material or to whom.

The government's first witness was Merendino, who recruited Acosta as an informant and was the case agent until 2008. Merendino testified that, to determine whether Acosta would be a suitable informant, Merendino had to evaluate whether Acosta had valuable and relevant information. RT 19. Merendino also researched Acosta's criminal history, because "[i]f he had an extensive criminal history in either the U.S. or in his country of origin, we would likely opt to not utilize him as a source, due to the liability concerns." RT 21. Merendino did not ask Acosta whether Acosta had committed any violent crimes in Honduras. RT 20-21. In July of 2005, after Merendino researched his criminal history, Acosta was activated as a formal source. *Id.* From approximately April 2006 until September 2007, Acosta did not work as an informant. RT 23-26. He was reactivated in September 2007.

The only evidence of the possible materiality of Acosta's alleged false statements consisted of the following exchange:

> Q:    What difference, if any, would it make between knowing that he had carried a firearm, and that he had committed eight murders?

| | | |
|---|---|---|
| A: | Oh, a very big difference. | |
| Q: | How so? | |
| A: | I mean, eight murders is eight murders.  Those are horrific acts of violence.  So carrying a makeshift bamboo firearm is very different from committing an actual act of violence. | |
| Q: | And how would it have made a difference in whether or not he could act as an informant for ICE? | |
| A: | He definitely would not have acted as an informant for ICE if we had knowledge that he committed eight homicides. | |
| Q: | What would be the concern? | |
| A: | General liability concern of . . . for the Government and the public safety here in the United States. | |

RT 57-58.  This theory of materiality was not charged in the complaint, the indictment, or mentioned in the Government's opening statement.  Nor did Merendino explain how Acosta's debriefing statement in December of 2008 could have affected his decision making concerning Acosta when Merendino was no longer working as Acosta's supervising agent at the time of the debriefing.

The government, however, did try to pursue the theory of materiality actually charged in the indictment.  The government explained that theory to the Court as follows:  "The false statement that he had not committed murders was, in fact, and did influence the government in deciding whether or not to call him as an informant, because it would change the terms by which he would testify.  He wouldn't simply be someone, standing there – or on the stand, testifying, without any sort of agreement, any – any – whether it's non-prosecution, whether it's agreement where he admitted  to certain criminal conduct, there wouldn't be that circumstance."  RT 155-56.

Agent Moore testified that knowing Acosta's criminal history is important to "know him as a witness, and his credibility and integrity."  RT 81.  He further explained that he thought that:

> the investigation was significantly damaged, in the sense that I didn't know who I was talking to.  You know, everything had changed surrounding the details of what he had told us in his criminal history.  And it goes to his integrity.  It goes to his believability on the stand.  So from our – at this point, we're – there's not really an active criminal investigation. It's a trial prep process.

RT 169 (Moore testified that trial preparation process started in February 2008).

However, decisions about whether a witness would testify, or the credibility of a witness

9

at trial, were not the job of Moore or anyone else at ICE – those decisions were the job of the prosecutors.  RT 172; RT 140 ("That's not my job, to decide any of those --- those—[issues about whether Acosta would testify]); RT 144 ("I'm not one of the attorneys deciding on who to call or not to call to the stand, as far as strategy, you know").  Because Moore lacked sufficient foundation to testify about whether Acosta was called as a witness, and if not why not, this Court sustained defense counsel's objection to the prosecutor's attempt to elicit that information from Moore.  RT 161-162.

No prosecutor was called to testify about whether Acosta testified at trial or, if he was not called as a witness, why he was not called.  There was no competent evidence that Acosta's allegedly false statements influenced the government's decision to call or not call him as a witness.

## F.    The Government's Closing Argument

The government argued in closing that multiple statements of Acosta were lies.  The government further argued that "[t]he problem that the defendant faced in telling these lies is he had to tell it over and over and over.  He had to tell it to different people.  He had to tell it in different contexts at different times. . . .   And you heard from Special Agent Moore that the defendant lied repeatedly, until February of this year, when he couldn't hold on to that lie any longer, and he dropped the bombshell in that meeting on February 2."  RT 15 (7/12/11). The government again argued that Acosta told at least two lies:  "but it became clear in February of this year that the defendant lied in May 2008; that he lied in December 2008 about whether or not he personally killed anyone."  RT 18 (7/12/11).  And again:  "he lied in May 2008 . . . he lied on December 2008."  RT 24 (7/12/11).

At one point, the government argued that Acosta's false statements were material because "ICE wouldn't have signed him up as an informant if they knew that he was an eight-time murderer."  RT 25 (7/12/11).  Later, the government argued that "the lie that the defendant told over and over again" was material because "the fact that there was now a meeting [on February 28] to discuss how the defendant's revelations about his murders had to be addressed proves that the lie the defendant told over and over again . . . was, of course, capable of affecting

how the agents and prosecutors did their work." RT 26 (7/12/11).

In rebuttal, the government stated that "the question isn't simply whether they would continue to

have him as a witness, but how they would present him as a witness." RT 39 (7/12/11). The

government continued, until finally interrupted by this Court:

> [T]the question isn't simply whether they would continue to have him as a witness, but how they would present him as a witness. And you heard evidence that they talked about what criminal charges he would have to plead to in order to become a witness. This is all proof that this was a material fact that affected how ICE
> ---
> THE COURT:  Well, counsel, I'm not sure you can argue how would the Government be able to present him as a witness. I think that's not an appropriate argument to make. It calls for speculation. The Government has, from time to time, used all sorts of people as witnesses. (*Id.*)

The government repeatedly argued that Acosta's statements were "capable of affecting

how agents *and prosecutors* would do their work. RT 9 (7/12/11).

### G.    The Court's Instructions

The Court's Instructions on the elements of the charged offense were as follows:

> The defendant is charged with knowingly and willfully making a false statement in a matter within the jurisdiction of a government agency in violation of 1001 Title 18 of the United States Code.
>
> For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt.
>
> First, the defendant made a false statement in a matter within the jurisdiction of Immigration and Customs Enforcement.
>
> Second, the defendant acted willfully, that is deliberately and with knowledge that the statement was untrue; and
>
> Third, the statement was material to the activities or decisions of Immigration and Custom Enforcement.
>
> A statement is material if it had natural tendency to influence, or was capable of influencing the agency's decision or activities.

RT 8 (7/12/11).

Nowhere in the jury instruction, the argument of counsel, or on the verdict form was the

jury apprised that the only statement charged as false was Acosta's December 2008 statement,

nor was the jury told that it had to unanimously agree on the specific false statement alleged in the indictment.

**I.      MR. ACOSTA MUST BE ACQUITTED UNDER RULE 29 BECAUSE THE GOVERNMENT FAILED TO PROVE THE CHARGED THEORY OF MATERIALITY; ALTERNATIVELY, HE IS ENTITLED TO A NEW TRIAL UNDER RULE 33**

**A.      The Rule 29 Standard**

Rule 29 mandates acquittal where evidence is insufficient to sustain a conviction. Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 324 (1979); *see also United States v. Nevil*s, 598 F.3d 1158, 1164-1167 (9th Cir. 2010) (en banc); *United States v. Milwitt,* 475 F.3d 1150, 1152 (9th Cir. 2007). As *Jackson* held, a mere modicum of evidence cannot support conviction beyond a reasonable doubt. 443 U.S. at 320. Where the government relies on circumstantial evidence, the inferences drawn therefrom must be reasonable and not speculative. *United States v. Charles,* 313 F.3d 1278, 1284 (11th Cir. 2002);; *Ssee also Van Liew v. United States*, 321 F.2d 674, 678 (5th Cir. 1963) ("In acquitting on perjury charge, Fifth Circuit holds that the "Government's proof must be by substantial evidence excluding to the satisfaction of the jury every other hypothesis than that the Defendant in testifying as he did purposefully misstated the fact knowing it to be false and untrue. [citations omitted]").

**B.      The Charged Theory of Materiality**

An indictment must plead not only the elements of a charged offense, but facts sufficient to permit the defendant to prepare his defense to those facts. As the Supreme Court explained in *Hamling v. United States*, 418 U.S. 87 (1974):

> Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. . . . 'Undoubtedly the language of the statute may be used in the general description of an offence, *but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.*'

*Id.* at 417-18, quoting *United States v. Hess*, 124 U.S. 483, 487 (1888) (emphasis added).

As noted in the indictment, the factual theory of materiality contained in the indictment–*i.e.*, what agency's decisions were likely to be influenced by Acosta's statements during the December, 2008 debriefing-- was less than clear, but the reference to federal prosecutors, and the timing of the charged statement, and the government's own arguments at trial, rendered that theory apparent.  In December of 2008, Acosta's work as an informant was over, and he was under the control of federal prosecutors. The indictment thus alleged that his charged statements were material to decisions of those prosecutors as to whether Acosta would be called as a witness at the 2011 MS-13 trial.

### C.   The Government Failed To Prove the Theory of Materiality It Charged, Requiring Acquittal Under Rule 29

Mr. Acosta's argument under Rule 29 as to the government's failure to prove its charged theory of materiality can be brief, because this Court has already embraced it.   The indictment alleged the theory that Acosta's statements during the December, 2008 debriefing influenced the prosecutors' decision not to call him at the MS-13 trial.  But the record contains no competent evidence as to whether Acosta was called as a witness and, if not, whether his December, 2008 statements played any role in that decision.  Indeed, ICE Agent Moore expressly testified that only federal prosecutors had the power to decide whether a potential witness would be called, and that he could not speak for them. RT 172; RT 140 ("That's not my job, to decide any of those --- those—[issues about whether Acosta would testify]); RT 144 ("I'm not one of the attorneys deciding on who to call or not to call to the stand, as far as strategy, you know").  Because of Moore's lack of knowledge, this Court sustained defense counsel's objection to the government's effort to elicit information as to Acosta's status as a witness in the MS-13 trial from Moore.  RT 161-62.

No prosecutor was called to the stand.  For that reason, the Court ruled that the government had not offered sufficient evidence to support an argument in closing that the charged statement had resulted in a decision not to call Acosta as a trial witness.  *A fortiori*, the government failed to prove beyond a reasonable doubt the theory of materiality charged in the

1    indictment.

2        Furthermore, to the extent that the government offered any competent evidence

3    whatsoever on the issue of whether Acosta's debriefing statement caused him not to be called as

4    a witness, it supported the conclusion that the debriefing statement was immaterial to the

5    prosecutor's decision in that regard.  After Acosta's February 2, 2011 revelation of additional

6    murders, the government continued to try to use Acosta as a witness.  In fact, the prosecutor told

7    Acosta that "nothing had changed."  RT 164 (Moore "remember[ed] Wilson Leung telling

8    Roberto that, you know, as of then, there was – nothing had changed").  This Court noted that

9    fact at trial.  RT 151: (The Court:  "I don't even know you have any testimony in the record,

10   really, that goes to, quote, the 'materiality' of the statements; not that the statements aren't

11   important statements; but material to the prosecution, if, in fact, the prosecution, as of a couple

12   months ago, was willing to call him as a witness"); RT 155: (The Court:  "In other words, in this

13   particular case, the government was willing to call him as a witness.")

14       At another point, the government attempted to argue to the Court that the reason it

15   refrained from calling Acosta to the stand during the MS-13 trial was *not* because he lied about

16   his prior criminal activity in Honduras, but because he would invoke his Fifth Amendment

17   privilege if questioned about that activity.  RT 157 (Ms. Wong:  "[T]he government can't call a

18   witness who would be taking the Fifth, essentially, or not answering questions about that

19   conduct.  And as a result, the government has not called Mr. Acosta as a witness in that case");

20   RT 221:  (Ms. Wong:  "[T]he Government couldn't call [Acosta], because [Acosta] had stated

21   that he would not answer questions about his past criminal conduct; about the murders in

22   Honduras").  If that was the case, Acosta's lie in December of 2008 about his involvement in

23   past murders in Honduras was *immaterial* to the decision not to call him at trial, which rested on

24   his invocation of his Fifth Amendment privilege.  That is yet another reason why Mr. Acosta

25   must be acquitted, as is also the fact that the Court ruled the government failed as a matter of fact

26   to prove this theory as well.  RT 221 ("We don't have evidence of that [i.e., Acosta did not

27   testify because he invoked his constitutional privilege.])

28       Finally, as a result of evidentiary insufficiency, the jury was never instructed on the

                                        14

theory of materiality charged in the indictment.  The only theory of materiality given to the jury was that "the statement was material to the activities or decisions of Immigration and Custom Enforcement," not to the decisions of federal prosecutors.  A defendant can only be convicted based on a theory on which a jury is instructed.  *See, e.g., United States v. McCormick*, 500 U.S. 257, 270 n.8 (1991) ("[C]ourts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.").

For all these reasons, Mr. Acosta must be granted acquittal under Rule 29.

### D. As The Government Failed To Prove the Theory of Materiality It Charged, Mr. Acosta Is Alternatively Entitled to A New Trial Under Rule 33

If a district court grants a judgment of acquittal, it *"must* also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1) (emphasis added).

Under Rule 33, which governs motions for a new trial, a district court possesses a power to scrutinize and set aside a jury verdict much broader than the Rule 29 power to grant a motion for judgment of acquittal.  *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000).  Unlike under Rule 29, a trial court deciding a Rule 33 motion is not "obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *Kellington*, 217 F.3d at 1097.  If the court determines after weighing the evidence that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, and submit the issues for determination by another jury." *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

A "court of appeals will only rarely reverse a district judge's grant of a defendant's motion for a new trial, and then only in egregious cases." *United States v. Alston*, 974 F.2d 1206, 1211-1211 (9th Cir. 1992)*.* In *Kellington*, the court affirmed the district court's grant of a new trial, deferring to the trial judge's "evaluation of the testimony at trial (especially [the defendant's)" and its determination that "there was no direct evidence of [the defendant's] mental state." 217 F.3d at 1099-1101.  Similarly, in *Alston*, the Ninth Circuit noted that

15

"[a]lthough the jury apparently chose to believe the government's version of events, a reasonable trier of fact could have come out the other way" in light of the fact that "[t]he [defendants] offered alternative explanations for almost everything the government presented." 974 F.2d at 1212-13.  The Court deferred to the district judge's "determin[ation] that the evidence weighed heavily against the verdict" with regard to the requisite *mens rea* for the charged conspiracy. *Id.* at 1213.

When a trial judge concludes that the evidence was insufficient to convict as a matter of law, that same judge must necessarily conclude that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."  For all the reasons why Mr. Acosta is entitled to acquittal under Rule 29, he is alternatively entitled to a new trial under Rule 33.  Thus the Court should enter a conditional order for a new trial under Rule 33 as well as a directed verdict under Rule 29.

## II.   THE GOVERNMENT FAILED TO PROVE THE UNCHARGED THEORY ON WHICH THE JURY WAS INSTRUCTED

### A.   The Government Failed to Prove The Theory of Materiality on Which the the Jury Was Instructed, Again Requiring Acquittal Under Rule 29 and a Conditional Grant of A New Trial Under Rule 33

The jury was instructed that the government had to prove that "the statement was material to the activities or decisions of Immigration and Custom Enforcement.  A statement is material if it had natural tendency to influence, or was capable of influencing the agency's decision or activities." RT 8 (7/12/11)  In support of this "ICE" theory of materiality, ICE Agent Merendino testified that:

> Q:   And how would it have made a difference in whether or not he could act as an informant for ICE?
>
> A:   He definitely would not have acted as an informant for ICE if we had knowledge that he committed eight homicides.
>
> Q:   What would be the concern?
>
> A:   General liability concern of . . . for the Government and the public safety here in the United States.

RT 57-58.

"A false statement's capacity to influence [the agency] must be measured at the point in

16

1   time that the statement was uttered." *United States v. Sarihifard*, 155 F.3d 301, 307 (4th Cir.

2   1998) (citing *United States v. Holley*, 942 F.2d 916, 923 (5th Cir. 1991)).  Thus to be material

3   under the government's ICE theory, Acosta's allegedly false statement had to be capable of

4   influencing ICE's decision to use him as an undercover informant.  But Merendino first

5   employed Acosta to act as an informant in 2005, and then again in 2007.  By May 2008, ICE was

6   through using Acosta as an informant, and continued to move forward with him as a witness.

7   RT 169, 173.  By December of 2008, Merendino was no longer Acosta's supervisor, and the ICE

8   investigation was over, terminated when the MS-13 indictment was handed down in October of

9   2008.  Thus, the trial evidence affirmatively proved that Acosta's debriefing statement in

10  December of 2008 could not, as a matter of law, have been material to ICE's decision to use him

11  as an undercover informant between 2005 and, at the latest, October of 2008.;  The government

12  failed to prove the ICE theory of materiality upon which the jury was instructed, again requiring

13  acquittal under Rule 29, as well as a conditional grant of a new trial under Rule 33.

14  **B.     The Government's Reliance On An Uncharged Theory of Materiality**
              **Requires a New Trial Under Rule 33**

15      For the reasons stated above, it is clear that the only theory of materiality charged in the

16  indictment was that the December, 2008 debriefing statement influenced the federal prosecutors'

17  decision not to call Acosta at trial.  But the single theory on which the jury was instructed was

18  the factually distinct proposition that the debriefing statement influenced the decision by ICE

19  agents to employ Acosta as an undercover informant.

20      The Fifth Amendment guarantees a criminal defendant the right to stand trial only on

21  charges made by the grand jury in its indictment.  *Stirone v. United States*, 361 U.S. 212 (1960)

22  (Under Fifth Amendment's Grand Jury Clause, a defendant may not be convicted on a factual

23  theory of liability different than one on which he was indicted, even if that uncharged theory is

24  supported by the evidence.); *United States v. Adamson*, 291 F.3d 606, 614-16 (9th Cir. 2002).

25  After an indictment has been returned and criminal proceedings are underway, the indictment's

26  charges may not be broadened by amendment, either literal or constructive, except by the grand

27  jury itself. *Id*.  An amendment of the indictment occurs when the charging terms of the

28

17

indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them. *Id* A prejudicial variance occurs when the evidence offered at trial proves facts materially different from those alleged in the indictment. *Id*.

In *Adamson* the indictment alleged, and the government represented pretrial, that criminal liability was based upon one specific misrepresentation that computer servers had been upgraded. However, conviction was obtained upon jury instructions, given over defense objection, that allowed conviction based upon a different alleged misrepresentation on *how* servers had been upgraded. The Ninth Circuit reversed Adamson's conviction. Likewise, in *United States v. Shipsey,* 190 F.3d 1081, 1085-88 (9th Cir. 1999), the Circuit found a constructive amendment in that the jury instructions contained a different theory of fraud than that charged in indictment.

"Here, the indictment alleged that Shipsey executed his crime by false pretenses, but the district court's jury instructions permitted the jury to convict Shipsey if he obtained the pension fund money by a 'wrongful act' or if Shipsey converted the money." *Id.* at 1086. *Shipsey* found an impermissible constructive amendment of the indictment because the jury instructions allowed a conviction based upon a legal theory other than the false pretenses fraud charged in the indictment.

The jury in this case was instructed here on a theory of materiality not charged in the indictment. The indictment and the government's own arguments at trial made it clear that the theory upon which Acosta was charged, and which the government tried, unsuccessfully, to pursue at trial, was that Acosta's December 2008 statement was material to the government's unproven decision not to call Acosta as a witness. The theory of materiality contained in the jury instructions, however, was that Acosta's December 2008 statement was material to ICE's 2005 and 2007 decisions to use him as an informant. This shift in theory constructively amended the indictment. Absent acquittal, a new trial must be ordered under Rule 33 due to the constructive amendment of the indictment.

III.   **THE COURT'S INSTRUCTIONS AND THE GOVERNMENT'S CLOSING ARGUMENT PERMITTED THE JURY TO CONVICT ON A FALSE STATEMENT OTHER THAN THE SINGLE STATEMENT CHARGED IN THE INDICTMENT, REQUIRING A NEW TRIAL UNDER RULE 33**

Indisputably, the indictment alleged a single statement made at a specific time as the basis for the section 1001 offense with which Acosta was charged.  That being so, the jury was constitutionally barred from convicting the defendant of making a false statement at any other time than December of 2008, when he was alleged to have "falsely denied being involved in any murders or attempted murders aside from one indictment involving bus drivers in Honduras, when in fact, he was directly involved in approximately eight additional murders in Honduras." Indeed, during trial the Court commented that this was the single basis upon which Mr. Acosta could legally be convicted.[2]

Furthermore, to validly convict Acosta, all jurors had to agree unanimously that he told a material falsehood in December of 2008.  Were even one juror to vote to convict based on a statement other than that contained in the indictment, Mr. Acosta's right to a unanimous jury would be violated.

At trial, the government introduced evidence that, while acting as an undercover informant between 2005 and 2008, on numerous occasions Acosta described crimes he committed in Honduras, including robbery and stealing (RT 76), possession of a homemade shotgun (RT 75); driving around with other MS-13 members with guns in the car, looking for rival gang members (RT 76); collecting money from drug dealing (RT 76), and grenade smuggling (RT 80).  It also introduced evidence that in May 2008, Acosta was first asked directly about his participation in murders, and he denied participating in any.  RT 138-40.  The introduction of this evidence was not necessarily error in itself, as it arguably provided background context to the offense charged, but it raised the danger that one or more jurors might

---

2 During the colloquy on jury instructions, the Court discussed the fact that jurors might conclude that, rather than lying in December of 2008 by denying committing murders, Acosta was lying when he claimed to have committed them in February 2011.  The Court then noted that this was "not the government's position at all," with which AUSA Wong agreed, and that "that would make a false statement that he's not accused of having made." RT 202-203.

1   rest their verdict on a statement other than that of December, 2008.

2       Rather than making clear, however, that Acosta could be convicted based only on a

3   finding that he told a material falsehood in December of 2008, the government vigorously

4   argued that Mr. Acosta had told multiple falsehoods during his service as an undercover

5   informant.  "The problem that the defendant faced in telling these lies is he had to tell it over and

6   over and over.  He had to tell it to different people.  He had to tell it in different contexts at

7   different times. . . .  And you heard from Special Agent Moore that the defendant lied repeatedly,

8   until February of this year, when he couldn't hold on to that lie any longer, and he dropped the

9   bombshell in that meeting on February 2."  RT 14-15 (7/12/11).  The government then

10  emphasized that Acosta had told at least two lies, without distinguishing between the one

11  charged and the one uncharged:  "but it became clear in February of this year that the defendant

12  lied in May 2008; that he lied in December 2008 about whether or not he personally killed

13  anyone."  RT 18 (7/12/11).  And again:  "he lied in May 2008 . . . he lied on December 2008."

14  RT 24 (7/12/11).

15      Given that argument, Mr. Acosta's right to be convicted on the accusation contained in

16  the indictment could be protected only if the Court's instructions contained a clear message to

17  that effect.  But the instructions required only that the government prove that "the defendant

18  made a false statement in a matter within the jurisdiction of Immigration and Customs

19  Enforcement," and made no mention that the false statement charge was limited to the debriefing

20  statement in December of 2008, or of the content of that false statement as alleged in the

21  indictment.  This case is thus on all fours with that of *Adamson* and *Shipsey* in that the jury was

22  permitted to convict on a different theory and factual basis than that charged in the indictment.

23  A new trial is required because the government's closing argument and the Court's instructions

24  constructively amended the indictment.

25      Furthermore, while the Court's instructions contained a general unanimity instruction,

26  that instruction did not require jurors to be unanimous as to the statement upon which their

27  verdict rested.  Thus, the jury was informed that all twelve had to agree that  Acotsta made a

28  materially false statement, but the instructions left jurors free to reach unanimity by six basing

their verdict on the statement in May of 2008 (or the multiple statements made by Acosta before then) and six relying on the December, 2008 debriefing.  A specific unanimity instruction is required when, as here, there is a "genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *United States v. Lyons,* 472 F.3d 1055, 1068 (9th Cir.), *cert. denied*, 127 S.Ct. 2285 (2007). *United States v. Holley*, 942 F.2d 916, 923 (5th Cir. 1991) (False statement conviction reversed for failure to give a specific unanimity instruction)  No specific unanimity instruction was given here, yet another reason a new trial is required.

## IV.   THIS POST-TRIAL MOTION IS TIMELY

This motion is timely under Rules 29 and 33 of the Federal Rules of Criminal Procedure. While both rules ordinarily require a post-trial motion to be filed within 14 days of the verdict, Rule 45(b)(1)(B) provides that a court may "for good cause shown" extend those deadlines,[12] even after the time has expired, if "the party failed to act because of excusable neglect."  The ineffective assistance of trial counsel can constitute "excusable neglect" necessary to support an extension of time.  *See United States v. Munoz*, 605 F.3d 359, 367-72 (6th Cir. 2010).  Here, counsel's failure to move for a judgment of acquittal under Rule 29 or for a new trial under Rule 33 was objectively unreasonable and prejudiced Acosta.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  This Court repeatedly expressed its concern that the Government had failed to prove the materiality element of its case.  Because the claims raised herein are meritorious, defense counsel's failure to raise them in a post-trial motion was objectively unreasonable, thereby permitting this Court to decide the claims on the merits.

//

//

//

//

//

21

**CONCLUSION**

For all the foregoing reasons, the Court should acquit the defendant or vacate defendant's convictions and order a new trial.

Dated: November 16, 2011                    Respectfully submitted,

                                            RIORDAN & HORGAN


                                            /s/ Dennis P. Riordan
                                            DENNIS P. RIORDAN

                                            LAW OFFICES OF MARTHA BOERSCH


                                            /s/ Martha Boersch
                                            MARTHA BOERSCH

                                            Attorneys for Defendant
                                            ROBERTO ACOSTA