1   MELINDA HAAG (CABN 132612)
    United States Attorney
2
    MIRANDA KANE (CABN 150630)
3   Chief, Criminal Division

4   WILLIAM FRENTZEN (LABN 24421)
    J. DOUGLAS WILSON (DCBN 412811)
5   Assistant United States Attorneys

6      450 Golden Gate Ave., Box 36055
       San Francisco, California 94102
7      Telephone:  (415) 436-6959
       Fax: (415) 436-7234
8      E-Mail: william.frentzen@usdoj.gov

9   Attorneys for Plaintiff

10                  UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14
    UNITED STATES OF AMERICA,        )   No. CR 11-00182 CRB
15                                    )
          Plaintiff,                  )   UNITED STATES' OPPOSITION TO
16                                    )   DEFENDANT'S MOTION FOR
       v.                             )   JUDGMENT OF ACQUITTAL OR
17                                    )   FOR A NEW TRIAL
    ROBERTO ACOSTA,                   )
18                                    )   Date: December 14, 2011
          Defendant.                  )   Time: 10:00 a.m.
19   ─────────────────────────────── )

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF CON TESTS**

3

4

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.     The indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5

B.     Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6

C.     Post-trial events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8

A.     The motion is untimely. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

9

B.     The trial record establishes materiality  . . . . . . . . . . . . . . . . . . . . . 12

10

C.     The evidence at trial did not constructively amend the indictment.  . . . . . 15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*Cullen v. Pinholster,* 131 S. Ct. 1388 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hamling v. United States,* 418 U.S. 87 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Jackson v. Virginia,* 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Knowles v. Mirzayance,* 129 S. Ct. 1411 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kungys v. United States,* 485 U.S. 759 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pioneer Investment Services Co. v. Brunswick Assoc.,* 507 U.S. 380 (1993) . . . . . . . . . . . . . 9

*Stirone v. United States,* 361 U.S. 212 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Strickland v. Washington,* 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Adamson,* 291 F.3d 606 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Alston,* 974 F.3d 1206 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Bhagat,* 436 F.3d 1140 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 16, 19

*United States v. Doss,* 630 F.3d 1181 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Driggers,* 559 F.3d 1021 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Freeman,* 498 F.3d 893 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Hartz,* 458 F.3d 1011 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Miller,* 471 U.S. 130 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*United States v. Munoz,* 605 F.3d 359 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Nevils,* 598 F.3d 1158 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Peterson,* 538 F.3d 1064 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Service Deli, Inc.,* 151 F.3d 938 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . 12

*United States v. Somsamouth,* 352 F.3d 1271 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Vaughn,* 797 F.2d 1485 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**STATUTES**

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

More than three months after trial, defendant Roberto Acosta has filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, a motion for a new trial under Federal Rule of Criminal Procedure 33.  As Acosta concedes, the motion is untimely.  Because Acosta cannot show excusable neglect for his untimely filing, the motion should be denied.  The motion should also be denied if this Court reaches the merits because there is no merit to Acosta's claim that the government failed to prove materiality or that its theory of materiality differed from that alleged in the indictment.

## BACKGROUND

**A.     The indictment**

On March 29, 2011, a grand jury in this district returned an indictment charging Acosta with one count of making a false statement in a matter within the jurisdiction of the executive branch of the United States government, in violation of 18 U.S.C. § 1001. Dkt. 10.  The charging language of the indictment stated as follows:

In or about December 2008, in the Northern District of California, the

defendant,

ROBERTO ACOSTA,
a/k/a "Zoro,"
a/k/a "Little Bad Boy,"
a/k/a "Bad Boy,"

unlawfully, knowingly, and intentionally, in a matter within the jurisdiction

of the executive branch of the Government of the United States, did make a

materially false, fictitious, and fraudulent statement and representation, to

wit, during a debriefing with federal prosecutors and a Special Agent with

Immigrations and Customs Enforcement, ACOSTA falsely denied being

involved in any murders or attempted murders aside from one incident

involving bus drivers in Honduras, when in fact, he was directly involved in

approximately eight additional murders in Honduras.

Dkt. 10.

**B.    Trial**

Trial on the indictment began on July 11, 2011.  At the outset of her opening statement, the prosecutor told the jury that "the defendant is guilty of providing a false statement – a material false statement – to ICE agents and to federal prosecutors; in other words, making a false statement that affected how they handled their work."  7/11/11 RT 4.  During the remainder of her opening statement, the prosecutor did not return to the subject of materiality.  Instead, the prosecutor explained the factual circumstances that culminated in Acosta's admission that he had lied to the government when he denied committing any murders.

In particular, the prosecutor told the jury that Acosta had worked as an informant in an investigation of the gang MS-13 for Immigrations and Customs Enforcement (ICE) from 2005 to 2008, except for a period in 2006 and 2007, when he stopped returning the agents' calls and was deported to Honduras.  The prosecutor explained that Acosta had made "hundreds of hours of recordings of…MS-13 members committing crimes" and given ICE agents "valuable information," including information about crimes that were about to occur.  7/11/11 RT 5-6.  While cooperating, the prosecutor explained, Acosta had meetings with prosecutors and ICE agents "to talk about being a witness in any future trial of the people he had provided information about."  *Id*. at 6

Prior to December 2008, although Acosta admitted to a "long list of crimes," he never admitted to murder.  According to the prosecutor, at a meeting in December 2008, Acosta first admitted to having passed along orders to kill three bus drivers in Honduras who had failed to make payments to MS-13.  The prosecutor told the jury that during that meeting, Acosta was asked, "point blank, Have you personally killed anyone?  And he said, no, he had not." 7/11/11 RT 7.  In February 2011, however, "with a trial that was weeks away," an ICE agent and a prosecutor met with Acosta to prepare him as a witness. *Id*. at 8.  During this meeting, Acosta admitted that in Honduras, in 2003 and 2004, he had personally murdered five people and arranged for the killing of three others.  According

1    to the prosecutor, during this meeting, Acosta admitted that he had earlier lied when he

2    said he had not killed anyone.  *Id*. at 9.

3         The defense's brief opening statement made two claims: first, defense counsel

4    argued that Acosta was truthful in all of his meetings with the government.  Second,

5    counsel asserted that Acosta's admission to committing eight murders did not affect the

6    government's decision to use Acosta as a witness in the MS-13 trial and therefore that his

7    false statements to the government were not material.  7/11/11 RT 12-13.

8         The government called three witnesses: ICE Special Agent Christopher

9    Merendino, ICE Special Agent John Moore, and a representative of the Honduran police.

10   The two ICE agents testified to Acosta's recruitment as an informant, his infiltration of

11   MS-13, his providing information about MS-13 gang members, and his recording of

12   numerous meetings with MS-13 members.  7/11/11 RT 35, 69.  Agent Merendino also

13   testified that he learned that in Honduras Acosta had sustained a conviction for robbery

14   and a conviction for possession of a homemade firearm, *id*. at 20, and that he had engaged

15   in numerous thefts in Houston before he came to San Francisco.  *Id*. at 22.

16        Agent Moore testified that beginning in February 2008, Acosta had a series of

17   meetings with federal prosecutors in which he detailed his criminal history.  According to

18   Agent Moore, during meetings on February 19, May 7, and June 23, 2008, Acosta

19   admitted that while in Honduras prior to 2005, he had witnessed murders, kidnapped a

20   rival gang member, possessed a homemade firearm, and engaged in robbery and theft.  At

21   these meetings, Acosta also admitted to being a small-time drug dealer in San Francisco.

22   7/11/11 RT 72-84.

23        Agent Moore testified that at both the May 2008 and December 2008 meetings,

24   Acosta denied committing any murders.  At the December 2008 meeting, a prosecutor

25   asked Acosta for the first time if he ever ordered anyone killed or conspired to kill

26   anyone.  At that point, Acosta admitted that he was part of a group that in 2003 or 2004

27   had ordered the killing of three bus drivers in Tegucigalpa.  7/11/11 RT 88.  According to

28   Agent Moore, Acosta provided no other information about participating in murders.  *Ibid*.

On February 2, 2011, in a meeting with Agent Moore and another federal prosecutor, Acosta admitted to participating in eight other murders.  Agent Moore explained that the purpose of this meeting was to prepare for an upcoming MS-13 trial at which Acosta was to testify.  7/11/11 RT 94-95.  At that meeting, Acosta admitted for the first time that while in Honduras in 2003 and 2004, he had personally killed five people and directly ordered the murder of three others.  During the meeting, Acosta provided details as to each of the murders.  *Id*. at 101-07.

On the issue of materiality, Agent Merendino testified that before enlisting Acosta as an informant, he had researched Acosta's criminal history because, "[i]f he had an extensive criminal history in either the U.S. or in his country of origin, we would likely opt to not utilize him as a source."  7/11/11 RT 21.  On redirect, Agent Merendino stated that it would have made "a very big difference" if he had known that Acosta committed eight murders and that Acosta "definitively [sic] would not have been acting as an informant for ICE if we had knowledge that he committed eight homicides."  *Id*. at 57-58.  Agent Moore testified that Acosta's admissions in February 2011 constituted "extremely important, significant events that [he] felt changed a lot of things about the investigation, and where this investigation would go," because "[w]e had a considerably different person on our hands that – than we had believed prior to the meeting."  *Id*. at 113.  Agent Moore also stated that on February 4, 2011, Acosta was arrested.  *Id*. at 139.

Through cross-examination, defense counsel sought to elicit that the agents decided to use Acosta as an informant even though they knew that he had a significant history of violence, including robbery and using homemade firearms.  *See* 7/11/11 RT 38-39.  In cross-examining Agent Moore, counsel sought to elicit that even though Acosta admitted that he lied and was subsequently arrested, "he was still going to testify" at the upcoming MS-13 trial.  *Id*. at 139.  Counsel elicited that Agent Moore testified that on February 28, 2011, prosecutors met with Acosta's counsel to discuss whether it was possible for Acosta to testify at the MS-13 trial.  *Id*. at 142-44.

At the outset of the government's redirect of Agent Moore, the Court excused the

jury from the courtroom.  Outside the presence of the jury, the Court summarized the testimony on materiality, then questioned whether the government had proved that defendant's false statement was material if the evidence showed that after February 2, 2011, the government remained willing to use Acosta as a witness at the MS-13 trial. 7/11/11 RT 151-54.  The prosecutor responded that the government had to show only that Acosta's false statements were capable of influencing the government's decisions, not that the statements actually caused the government to take a particular action.  *Id*. at 155. The prosecutor explained that Acosta's "false statement that he had not committed the murders…did influence the Government in deciding whether or not to call him as an informant, because that would change the terms by which he would testify."  The prosecutor further explained, however, that the government had not elicited testimony about post-February 2, 2011 events, because the government had put in sufficient evidence to show that Acosta's false statements were material and testimony about post-February 2, 2011 events "would be getting into plea discussions about this very case."  *Id*. at 156.  Defense counsel explained that she believed it was "important to the materiality issue" to show that "no decision had changed" after Acosta's admissions on February 2, 2011.  *Id*. at 158.  At the conclusion of this colloquy, the Court ruled that the government could ask Agent Moore about events that occurred after February 2, 2011.  *Id*. at 160-61**.**

When redirect resumed, Agent Moore testified that Acosta's admissions on February 2, 2011, "significantly damaged" the MS-13 investigation.  Agent Moore testified that "it goes to [Acosta's] integrity.  It goes to his believability on the stand." 7/11/11 RT 169.  He concluded, "I had a pretty good idea that this going to be a significant problem for his testimony, in just being able to be a witness."  *Ibid*.

At the close of the government's case, the government sought to admit an order from Judge Alsup, who was presiding over the MS-13 trial, stating that the government had decided not to call Acosta in that trial.  7/11/11 RT 189-90.  After argument, the Court declined to admit that document.  *Id*. at 198.  Later, after a discussion of jury instructions, the Court asked whether either the government or the defendant intended to

1    argue that Acosta's false statements were not material because of events that occurred

2    after his admissions on February 2, 2011.  *Id*. at 211-12.  Defense counsel said that she

3    "certainly" intended to make that argument, because some evidence was presented that

4    after February 2 the government and Acosta tried to reach an accommodation under

5    which he would testify.  *Id*. at 212.  The government responded that although Acosta's

6    argument "relies entirely on evidence that is about the subject of plea discussions,"

7    Acosta had opened the door to allowing the government to argue that post-February 2

8    events showed the materiality of his false statements.  The prosecutor had the following

9    colloquy with the Court:

10           **MS. WONG**:        Right.  And the evidence permits my saying that there was

11           discussion after the February 2nd meeting about whether or not Mr. Acosta could

12           continue to be a witness, and whether or not he had to plead to certain criminal

13           charges in order to allow that to occur.

14           **THE COURT**:        Okay.  You can say that.  I think that's what the evidence is.

15           You can say that.

16    *Id*. at 214.

17           The Court similarly ruled that Acosta could argue that his statements were not

18    material because of events that occurred after February 2, 2011.  Toward the conclusion

19    of the discussion, the Court commented,

20           You know, there's some evidence in the record that they may have

21           conducted the investigation differently.…

22           Certainly, you know, we – they reached the day where, one month before

23           trial in which they'd invested millions of dollars or vast sums of money

24           involving hundreds – thousands of hours of recordings, and the use of an

25           undercover informant, their trial strategy, in their view, had to change,

26           because the witness who was going to – the witness who was going to

27           inculpate the group of defendants had credibility problems of a serious

28           nature.…

1    That's the materiality.

2  *Id*. at 236-37.

3    In closing argument, the prosecutor noted that "Special Agent Merendino testified

4  that, had ICE known that Mr. Acosta had committed eight murders, ICE would never

5  have approved releasing Acosta and allowing him to work the streets of San Francisco."

6  7/12/11 RT 13.  At the end of her closing, the prosecutor reminded the jury that "the

7  Government has to prove that the false statement was material."  The prosecutor argued,

8  "And your common sense tells you that a statement hiding the truth about eight murders –

9  that's a statement that has a natural tendency to influence someone's activities; someone's

10 decisions."  *Id*. at 24.  The prosecutor again asserted that Agent Merendino had testified

11 that "ICE wouldn't have signed [Acosta] up as an informant if they knew that he was an

12 eight-time murderer."  *Id*. at 25.  The prosecutor noted that the defense would likely argue

13 that "it didn't matter whether or not the defendant lied" because the government and

14 Acosta's lawyer were still discussing whether Acosta would testify for the government

15 after the February 2, 2011 meeting.  In response, the prosecutor argued that "[t]he fact

16 that there was now a meeting to discuss how the defendant's revelations about his

17 murders had to be addressed proves that the lie that defendant told over and over again –

18 the lie was, of course capable of affecting how the agents and the prosecutors did their

19 work."  *Id*. at 26.  According to the prosecutor, the "the truth would change how the

20 prosecutors and the agents viewed him; whether he would even have been put in the

21 position of being an informant for the Government."  The prosecutor concluded that if the

22 defendant had admitted that he killed eight people in his native country, "he would never

23 be allowed to be an informant, much less allowed to stay in this country, much less work

24 and get paid."  *Id*. at 26-27.

25    Defense counsel argued in closing that Acosta had never lied to the government,

26 but as the prosecutor predicted, she also argued that any false statements that Acosta

27 made were not material.  7/12/11 RT 33-34.  In particular, counsel argued that over time

28 the government learned that Acosta had engaged in extensive criminal behavior in

1  Honduras and this country, but the government never deviated from its decision to have
2  Acosta testify against MS-13.  Counsel asserted, "And when they learned of the eight
3  murders, they [the government] were still going to use him.  Nothing had changed."  *Id*. at
4  33.  The jury convicted Acosta later that day.

5  **C.     Post-trial events**

6         The presentencing report calculated Acosta's offense level as 6, and found that he
7  fell into Criminal History Category I, for a sentencing range of 0 to 6 months.  The PSR
8  noted, however, that "[g]iven the nature, circumstance, and duration of Acosta's prior
9  criminal record,…the defendant is more adequately represented by a Criminal History
10 Category VI, changing the advisory guidelines range for 0 to 6 months to 12 to 18
11 months."  PSR at 13.

12        Acosta's sentencing memorandum noted that by the date of sentencing (then set
13 for October 19, 2011), Acosta would have served 8 months and 6 days of incarceration.
14 The sentencing memoranda asked the Court to impose a "sentence of no additional time
15 in custody and no supervised release."  Acosta Sent. Memo. (Dkt. 51) at 2.  The
16 government asked the Court to impose the statutory maximum of 60 months.  Gov't Sent.
17 Memo. (Dkt. 50) at 1-6.

18        On October 19, 2011, the date set for sentencing, the Court reviewed the evidence
19 at trial, then stated, "I also reflect back upon the trial in this case, in which a number of
20 facts were presented which were not argued by defense counsel in connection with the
21 verdict, nor was a Rule 29 motion made, nor was a motion for a new trial made."
22 10/19/11 RT 6.  Without further explanation, the Court announced "its decision to
23 substitute counsel for the Defendant; to – continue the sentencing matter."  *Id*. at 6.  After
24 appointing new counsel for Acosta, the Court directed the parties to engage in "an
25 analysis of how you look at foreign activities in connection with assessing the criminal
26 history of the Defendant."  *Id*. at 7.  The Court also noted "a serious question…as to
27 whether to – to rely on statements made by the Defendant with respect to criminal
28 history."  *Id*. at 7.  Rather than engage in that analysis, new counsel filed motions for

1  judgment of acquittal and for a new trial.

2  **ARGUMENT**

3  **A.     The motion is untimely.**

4  As Acosta concedes (Memo. at 21), a motion under Federal Rules of Criminal

5  Procedure 29 or 33 must be made within 14 days of verdict.  The jury convicted Acosta

6  on July 12, 2011, and he filed his motion on November 14, 2011, well after the 14-day

7  deadline.  Accordingly, the motion is plainly untimely.  Under Federal Rule of Criminal

8  Procedure 45(b)(1)(B), a court may extend the time for filing a Rule 29 or Rule 33 motion

9  after the time for filing the motion has expired if the court finds that the defendant "failed

10  to act because of excusable neglect."  With little supporting argument, Acosta claims that

11  he has shown "excusable neglect" because his trial counsel rendered ineffective

12  assistance.  According to Acosta, "[t]his Court repeatedly expressed its concern that the

13  Government failed to prove the materiality element of its case," and, therefore, "defense

14  counsel's failure to raise [the claims in Acosta's motion] in a post-trial motion was

15  objectively unreasonable, thereby permitting this Court to decide the claims on the

16  merits."  Memo. at 21.  In fact, the existing record shows that counsel may have had

17  substantial reasons for her decision not to filed post-trial motions, and the record is

18  insufficient to establish that counsel provided ineffective assistance.

19  The determination whether a party has acted with "excusable neglect" requires a

20  multi-factor equitable analysis.  *See Pioneer Investment Services Co. v. Brunswick Assoc.*,

21  507 U.S. 380, 395 (1993); *see also United States v. Munoz*, 605 F.3d 359, 368 (6th Cir.

22  2010) (applying *Pioneer* analysis for Rule 33 motion).  The most critical factor under that

23  analysis is the "reason for the delay" in filing the motion.  *See Munoz*, 605 F.3d at 372.

24  As Acosta points out, ineffective assistance of counsel is a reason for delay in filing a

25  motion that may constitute "excusable neglect."  *Id*. at 369.

26  To establish ineffective assistance of counsel, Acosta "must show both deficient

27  performance by counsel and prejudice."  *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419

28  (2009).  As to the deficient-performance prong, the Supreme Court has explained, "[t]here

1    are countless ways to provide effective assistance in any given case," and that "[e]ven the

2    best criminal defense attorneys would not defend a particular client in the same way."

3    *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  "Recognizing the 'tempt[ation] for

4    a defendant to second-guess counsel's assistance after conviction'…counsel should be

5    'strongly presumed to have rendered adequate assistance and made all significant

6    decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster*, 131

7    S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 690).  To overcome that

8    presumption, Acosta must show that counsel failed to act "reasonabl[y] considering all

9    the circumstances."  *Strickland*, 466 U.S. at 688.  Accordingly, this Court should take a

10   "highly deferential" look at counsel's performance.  *Strickland*, 466 U.S. at 689.[1]  In

11   particular, the Court cannot find that counsel provided deficient performance simply

12   because, as Acosta asserts, the Court "had expressed its concern" over the government's

13   proof of materiality.  Instead, Acosta must present evidence to overcome the presumption

14   that counsel made reasonable choices at and after trial.

15          On the existing record, Acosta cannot show that his counsel engaged in deficient

16   performance by failing to file a Rule 29 or Rule 33 motion alleging that the government

17   failed to prove materiality or that the government's materiality showing constructively

18   amended the indictment.  At trial, the government proved that in December 2008, Acosta

19   lied when asked whether he had committed any murders and that he revealed that he had

20   lied in February 2, 2011.  As explained in greater detail below, an informant's and

21   potential witness's lie about his criminal history, and his later admission that he is a serial

22   killer who murdered complete strangers, including blameless women, solely because he

23   was told to do so, plainly has the potential of influencing prosecutors and agents.  In

24   addition, during the one-day trial, this Court made clear that it believed that the

25   government had introduced sufficient evidence to show materiality.  In fact, the Court's

26

27          [1]  If Acosta can show deficient performance, his claim that he was prejudiced by
     counsel's failure to file Rule 29 and Rule 33 motions depends on the merits of those
28   motions.

OPPOSITION TO POST-TRIAL MOTIONS
CR 11-00182 CRB                                 10

1    recitation of the government's theory of materiality (at 7/11/11 RT 236-37) presages the

2    theory that the government presented to the jury in closing argument the next day: a

3    potential witness's admission a few short weeks before trial that he committed eight

4    murders must be material.  Defense counsel sought to convince the jury that the

5    statements were not material by showing that the government continued to consider using

6    Acosta as a witness after he admitted the murders.  Having failed to do so, however,

7    counsel could reasonably have decided not to file a post-trial motion challenging

8    materiality.  In sum, because the Court had already expressly made clear that it thought

9    that the government had proved materiality, counsel could reasonably have concluded

10   that there was no point in filing post-trial motions raising that issue.

11          Moreover, counsel may have made a strategic decision to forgo filing post-trial

12   motions because those motions could delay a sentencing hearing at which Acosta would

13   receive a time-served sentence.  As Acosta's sentencing memorandum argued, by October

14   19, 2011, the date set for sentencing, Acosta has already served more than eight months'

15   incarceration.  At the same time, the PSR calculated his Guidelines range as 0 to 6

16   months.  Although the government sought a 60-month sentence, counsel may reasonably

17   have concluded that the Court would not impose a sentence greater than time served.

18   And, because Acosta was an admitted gang member, thief, and murderer, he may have

19   told counsel that he did not care about having a conviction for making a false statement if

20   he could get out of prison sooner rather than later.  Nor is it clear that Acosta wished to

21   appeal his conviction if he was immediately released from prison.

22          In short, counsel may have had legitimate reasons for deciding against filing post-

23   trial motions.  On this record, however, counsel has never been given an opportunity to

24   explain her reasons for failing to file post-trial motions.  Nor has there been any inquiry

25   into counsel's conversations with Acosta or Acosta's views on the post-trial steps that his

26   counsel should take.  Because counsel may well have had legitimate reasons for deciding

27   not to file post-trial motions, the existing record forecloses a finding that defense counsel

28   engaged in deficient performance.  For that reason, Acosta cannot show the requisite

1   "excusable neglect," and his motion should be denied.  At the least, an evidentiary

2   hearing is necessary at which defense counsel may explain her reasons for deciding not to

3   file a post-trial motion and, if necessary, Acosta can describe his discussions with

4   counsel.

5   **B.    The trial record establishes materiality**

6          Acosta alleges that "the government failed to prove its charged theory of

7   materiality" because the government failed to call a witness to testify that Acosta's

8   admission to committing eight murders was the reason that the government did not call

9   Acosta as a witness at the MS-13 trial.  Memo. at 2.  That argument depends in part on

10  Acosta's assertion that the indictment "alleged that [Acosta's] false statement to

11  prosecutors in December of 2008 was material to preparation and presentation of the

12  prosecution's case in the 2011 trial of the MS-13."  Memo. at 2.  Acosta's premise and

13  conclusion are both false; the indictment alleged a broad theory of materiality, and the

14  government was not required to call a witness to prove that Acosta had not testified at the

15  MS-13 trial.

16         A statement is material if it "has a natural tendency to influence, or was capable of

17  influencing, the decision of the decisionmaking body to which it was addressed."  *Kungys*

18  *v. United States*, 485 U.S. 759, 770 (1988); *see United States v. Peterson*, 538 F.3d 1064,

19  1072 (9th Cir. 2008) (quoting *Kungys*).  Contrary to the premise of Acosta's argument,

20  "'actual influence on agency action is not an element of the crime,'" *United States v.*

21  *Somsamouth*, 352 F.3d 1271, 1276 (9th Cir. 2003) (quoting *United States v. Vaughn*, 797

22  F.2d 1485, 1490 (9th Cir. 1986)), and "[t]he agency need not rely on the information [in

23  the false statement] in fact for it to be material."  *United States v. Service Deli, Inc.*, 151

24  F.3d 938, 941 (9th Cir. 1998).  As the Ninth Circuit has explained, "the test is the

25  *intrinsic* capabilities of the false statement itself, rather than the possibility of the actual

26  attainment of its end as measured by collateral consequences."  *Id.* at 941 (emphasis in

27  original; internal quotation marks and citation omitted).

28         Acosta must not only show that his counsel provided deficient representation, but

OPPOSITION TO POST-TRIAL MOTIONS
CR 11-00182 CRB                                    12

1    he must also meet the demanding standards for Rule 29 and Rule 33 motions.  A court

2    may not grant a Rule 29 motion for judgment of acquittal if it finds "'after viewing the

3    evidence in the light most favorable to the prosecution, [that] any rational trier of fact

4    could have found the essential elements of the crime beyond a reasonable doubt.'"

5    *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (quoting

6    *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).  Similarly, a court may grant a new trial

7    under Rule 33 only if "the evidence preponderates sufficiently heavily against the verdict

8    that a serious miscarriage of justice may have occurred."  *United States v. Alston*, 974

9    F.3d 1206, 1211-12 (9th Cir. 1992) (internal quotation marks and citation omitted).

10        Here, the indictment broadly alleged that Acosta falsely stated "during a debriefing

11   with federal prosecutors and a Special Agent with Immigration and Customs

12   Enforcement" that he had not been "involved in any murders or attempted murders aside

13   from one incident involving bus drivers in Honduras, when in fact, he was directly

14   involved in approximately eight additional murders in Honduras."  At trial, the

15   government sought to show that the false statement was material to both "federal

16   prosecutors" and ICE.  First, the government elicited testimony from Agent Merendino

17   that if ICE knew that Acosta had "an extensive criminal history in either the U.S. or in his

18   country of origin," it "likely" would not use him as an informant.  7/11/11 RT 21.  Acosta

19   asserts (Memo. at 2) that by December 2008, when he made the false statement charged

20   in the indictment, he had ceased actively collecting information as an informant, and,

21   therefore, Acosta argues, his false statement could not have affected ICE's decision

22   whether to use him as an informant.  In fact, Agent Moore testified that between June

23   2008 and December 2008, Acosta "was generating a lot of incredibly good information

24   from the streets about the activity of 20th Street MS," including information about "future

25   planned homicides that [MS-13 members] were discussing."  7/11/11 RT 85.

26        In any event, Acosta's role as an informant did not end when he ceased acting in

27   an undercover capacity.  As Agent Moore testified, over the two years between December

28   2008 and February 2011, Moore remained Acosta's "controlling agent," 7/11/11 RT 71,

1   and Acosta continued to work with Moore to determine the content of the recordings that

2   he made while interacting with MS-13 members and to prepare for trial. *Id*. at 69. Agent

3   Moore therefore had a basis for his testimony that Acosta's revelations "significantly

4   damaged" the MS-13 investigation. *Id*. at 169. In other words, although Acosta was no

5   longer interacting with MS-13 members, he continued to work with ICE to process the

6   fruits of his informant work.

7         Second, the government elicited evidence showing that Acosta's false statements

8   affected his ability to testify as a witness. Agent Moore testified that Acosta's admission

9   that he had participated in eight murders went "to his integrity. It goes to his believability

10  on the stand." Moreover, as the Ninth Circuit explained, materiality can be established by

11  the "intrinsic capabilities" of the false statement. As this Court noted in explaining the

12  government's theory of materiality, "one month before trial in which [the government

13  had] invested millions of dollars or vast sums of money involving hundreds – thousands

14  of hours of recordings, and the use of an undercover informant, their trial strategy, in their

15  view, had to change, because the witness who was going to – the witness who was going

16  to inculpate the group of defendants had credibility problems of a serious nature."

17  Similarly, during closing argument, the prosecutor argued materiality in terms of the

18  "intrinsic capabilities" of Acosta's false statements: "your common sense tells you that a

19  statement hiding the truth about eight murders – that's a statement that has the natural

20  tendency to influence someone's activities; someone's decisions." 7/12/11 RT 24. The

21  prosecutor also argued that the need for the February 28 meeting supported a finding of

22  materiality: "[t]he fact that there was now a meeting to discuss how the defendant's

23  revelations about his murders had to be addressed proves that the lie that defendant told

24  over and over again – the lie was, of course, capable of affecting how the agents and

25  prosecutors did their work." *Id*. at 26.

26        Acosta argues that the government failed to prove materiality because it did not

27  call a witness to testify as to why the government did not call him at the MS-13 trial.

28  There are at least two errors in this argument. First, to establish materiality, the

1    government need not prove an actual effect on the government's decision whether to call

2    Acosta at the MS-13 trial.  As set forth above, the government must only show that

3    Acosta's lies – and his subsequent admission of those lies – were capable of affecting the

4    government's decision to call him as a witness.  As the Court recognized at trial, a

5    cooperator's admission to eight murders, close to the eve of trial, is certainly capable of

6    affecting the government's decision to call him as a witness.  Second, as the parties' and

7    the Court's colloquy at trial revealed, the government could not call a witness to testify

8    that it had decided not to have Acosta testify at the MS-13 trial because that trial was still

9    ongoing on the date of Acosta's trial.  As the prosecutor observed, "there's no way [the

10   government] could introduce evidence that the Government was not going to ever call

11   Mr. Acosta at trial, given that the trial has not concluded."  7/11/11 RT 216.  In addition,

12   to the extent that the government could have introduced evidence that Acosta had not yet

13   testified at the MS-13 trial, the Court barred it from doing so.  *Id*. at 198.

14           In short, the evidence of materiality at trial was overwhelming.  Accordingly,

15   Acosta was not prejudiced by defense counsel's failure to file a Rule 29 or Rule 33

16   motion, and this Court should not grant Acosta either a new trial or a judgment of

17   acquittal.

18   **C.      The evidence at trial did not constructively amend the indictment.**

19           Acosta argues that the government's evidence and the Court's instructions

20   constructively amended the indictment.  He also asserts that the Court should have

21   required the jury to be unanimous as to the false statement on which their verdict rested.

22   In fact, taken together, the government's proof and the jury instructions permitted

23   conviction on the single false statement alleged in the indictment.  For that reason, no

24   constructive amendment occurred, and the Court was not required to give a specific

25   unanimity instruction.

26           "Constructive amendments occur when the prosecutor proves, or the court

27   instructs the jury to convict on, materially different facts or substantially different crimes

28   than those charged in the indictment."  *United States v. Driggers*, 559 F.3d 1021, 1025

OPPOSITION TO POST-TRIAL MOTIONS
CR 11-00182 CRB                                  15

(9th Cir. 2009); *see United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006) (constructive amendment exists if "complex of facts" proved at trial is "distinctly different" from those in indictment).  "[M]inor differences between an indictment and the proof offered at trial [can] be dismissed as 'nothing more than a variance.'" *United States v. Hartz*, 458 F.3d 1011, 1021 (9th Cir. 2006) (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)).  "A material variance exists if a materially different set of facts from those alleged in the indictment is presented at trial, and if that variance affects the defendant's 'substantial rights.'" *Bhagat*, 436 F.3d at 1146 (quoting *United States v. Adamson*, 291 F.3d 606, 615-16 (9th Cir. 2002)).  Trial evidence that narrows the charges in the indictment without adding any new offenses does not result in either an amendment or a variance; instead, only evidence or jury instructions that broaden an indictment can violate the Fifth Amendment's Indictment Clause.  *United States v. Miller*, 471 U.S. 130, 138-39 (1985).

Here, as already explained, the indictment alleged that in December 2008, Acosta made a false statement to "federal prosecutors and a Special Agent with Immigration and Customs Enforcement" by falsely denying that he had been involved in any murders other than the murders of the bus drivers.  At trial, the government argued in its opening and closing statements and proved at trial that at a meeting on December 12, 2008, a federal prosecutor asked Acosta "point blank" whether he had participated in any murders, either directly or as part of a conspiracy.  Agent Moore, who was present at the meeting, testified that Acosta denied participating in any murders.  In other words, the evidence directly showed that, as charged in the indictment, Acosta made his false statement to "federal prosecutors" and an ICE agent.

The evidence further showed that when Acosta told the truth, on February 2, 2011, and admitted to participating in eight murders, the revelation affected the government's preparation for the MS-13 trial.  From this evidence, the jury could infer that Acosta's lie in December 2008 was material.

Acosta avoids this straightforward explication of the evidence only by advancing a

1    mistaken view of the facts.  He repeats his claim that "the only theory of materiality
2    charged in the indictment was that the December, 2008 debriefing statement influenced
3    the federal prosecutors' decision not to call Acosta at trial."  Memo. at 17.  That assertion
4    is false in two respects.  First, the indictment alleges only that Acosta made a material
5    false statement; it does not contain a "theory of materiality."  Nor is there any
6    requirement that an indictment contain a "theory of materiality."  *See Hamling v. United*
7    *States*, 418 U.S. 87, 118 (1974) (indictment is sufficient if it tracks the statutory language,
8    gives notice of the offense charged, and allows defendant to raise a double jeopardy bar);
9    *United States v. Doss*, 630 F.3d 1181, 1189 n.2 (9th Cir. 2011) (indictment sufficient that
10   "adequately tracked the statutory language, set forth the necessary elements of the
11   offense, and included sufficient facts to inform [defendant] of the specific offense with
12   which he was charged and to enable him to plead acquittal or prior conviction of the same
13   offense").  Second, the plain language of the indictment broadly states that Acosta made a
14   material false statement to "federal prosecutors" and an ICE agent.  Accordingly, to the
15   extent that the language of the indictment implies a "theory of materiality," it suggests
16   that Acosta's statement was material to both prosecutors and ICE.

17        Next, Acosta argues that "[t]he jury in this case was instructed here on a theory of
18   materiality not charged in the indictment."  Memo. at 18.  In support of this claim, Acosta
19   alleges that "[t]he theory of materiality contained in the jury instructions…was that
20   Acosta's December 2008 statement was material to ICE's 2005 and 2007 decisions to use
21   him as an informant."  Memo. at 18.  Again, that assertion is simply not true.  The jury
22   instructions never mentioned ICE's investigation of MS-13 or its decisions in 2005 and
23   2007 to use Acosta as an informant.  It is true, as Acosta points out (Memo. at 3), that the
24   instructions did not mention "federal prosecutors" and told the jury only that it must find
25   that "the defendant made a false statement in a matter within the jurisdiction of
26   Immigration and Customs Enforcement" and that "the statement was material to the
27   activities or decisions of the Immigration and Customs Enforcement."  7/12/11 RT 8.  As
28   the Supreme Court has expressly held, however, no constructive amendment of the

1   indictment occurs when the jury considers a theory that "narrowed the indictment's

2   charges without adding any new offenses." *Miller*, 471 U.S. at 138.  Here, the indictment

3   alleged that Acosta made a false statement "in a matter within the jurisdiction of the

4   executive branch of the Government of the United States" by falsely denying his

5   participation in murders to "federal prosecutors" and an ICE agent.  At most, therefore,

6   the jury instructions narrowed the theory presented to the jury by failing to mention

7   "federal prosecutors"; they did not constructively amend the indictment or cause a

8   variance.

9        Acosta also claims that in closing the government argued that Acosta told lies on

10   occasions other than the meeting on December 12, 2008.  That argument, and the

11   evidence that supported it, Acosta asserts, amended or caused a variance from the

12   indictment and raised the possibility of juror confusion that the Court should have

13   addressed with a unanimity instruction.  Again, both Acosta's factual premise and his

14   conclusion are incorrect.

15        In opening statement, the prosecutor specifically identified the December 2008

16   meeting as the date on which Acosta made the charged false statement.  7/11/11 RT 9.

17   Agent Moore testified that Acosta was not asked directly about his participation in

18   murders until the December 2008 meeting.  For that reason, Agent Moore did not believe

19   that Acosta had lied before that meeting.  7/11/11 RT 166.  Moreover, the prosecutor

20   began her closing argument by quoting the false statement that Acosta allegedly made and

21   placing it during the December 2008 meeting.  7/12/11 RT 9.  Although the prosecutor

22   later asserted that Acosta had also lied in May 2008 when he denied personally killing

23   anyone, that claim did not expand the allegations of the indictment and could not have

24   confused the jury.  The government's theory at trial was that Acosta told the truth when in

25   February 2011, he admitted to personally killing five people and ordering the murders of

26   three others.  Even though the government charged, proved, and argued that Acosta lied

27   in December 2008 when he was directly asked whether he had participated in any

28   murders, it followed from the government's proof that he also lied in May 2008 when he

denied personally committing any murders.  Moreover, as Acosta concedes (Memo. at

19), the government may introduce criminal conduct beyond that charged in the

indictment, as long as it also proves the offenses charged in the indictment.  *See United*

*States v. Freeman*, 498 F.3d 893, 907 (9th Cir. 2007) (government may offer evidence

beyond that charged in the indictment to give "context for the charges"); *United States v.*

*Bhagat*, 436 F.3d at 1146 ("evidence not referenced in the indictment may be admitted for

impeachment or other legitimate purposes without effecting any changes to the

indictment") (internal quotation marks and citation omitted).  Here, the government

proved that Acosta made a false statement in December 2008, and the jury could not have

been confused by the prosecutor's arguing the necessary inference that Acosta also lied in

May 2008.

Finally, for the same reasons, there is no merit to Acosta's argument that the Court

should have instructed the jury that it must be unanimous as to Acosta's false statement.

Throughout the trial, the government made clear that it sought to show that Acosta lied in

December 2008.  As noted, moreover, the prosecutor began her closing by specifically

telling the jury that it had to decide whether Acosta made a false statement in December

2008.  The jury could not have been confused.

DATED: DECEMBER 7, 2011                    Respectfully submitted,

                                           MELINDA HAAG
                                           United States Attorney

                                                /s/
                                           _____
                                           WILLIAM FRENTZEN
                                           J. DOUGLAS WILSON
                                           Assistant United States Attorneys